UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

CENTURY INDEMNITY COMPANY, *et al.*,

                      Petitioners,

       -v-

AXA BELGIUM (F/K/A ROYALE BELGE INCENDIE
REASSURANCE)

                    Respondent.

------------------------------------------------------------------X

11 Civ. 7263 (JMF)

OPINION AND ORDER

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 9/24/12

JESSE M. FURMAN, United States District Judge:

On October 14, 2011, Petitioners Century Indemnity Company, ACE INA Insurance

("ACE INA"), ACE American Insurance Company, and ACE Property and Casualty Insurance

Company (collectively, "Petitioners" or "ACE") commenced this action, petitioning the Court

pursuant to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of

June 10, 1958 (the "Convention"), 9 U.S.C. §§ 201-208, to confirm three arbitral awards (the

"Awards") against Respondent AXA Belgium ("Respondent"). (Docket No. 2). On December

5, 2011, Respondent cross-petitioned to vacate the Awards under the Convention and the Federal

Arbitration Act ("FAA"), 9 U.S.C. §§ 1-16. (Docket No. 19). In addition to filing these

petitions, the parties have filed three motions to seal documents in light of a confidentiality

agreement covering the arbitration. (Docket Nos. 13, 32, 48).

For the reasons stated below, the petition to confirm the arbitration awards is

GRANTED, the cross-petition to vacate the arbitration awards is DENIED, and the motions to

seal are DENIED.

## I.      BACKGROUND

This case arises out of four reinsurance contracts, all of which contain binding arbitration clauses.  (Pet'rs' Reply Mem. of Law Ex. 1 Art. 20; *id.* Ex. 2 Art. 19, *id.* Ex. 3 Art. VIII; *id* Ex. 4 Art. XIII).[1]  Under two of the contracts, abbreviated Treaty 3083 and Treaty 1001 (Layers 1, 2, and 3) (together the "Treaty contracts"), Respondent's predecessor, Royale Belge Incendie Reassurance ("Royal Belge"), provided reinsurance to predecessors and affiliates of Petitioner Century Indemnity Company.  (Pet'rs' Mem. of Law at 2; Resp't's Mem. of Law at 1; Pet'rs' Reply Mem. of Law Exs. 1, 2).  Under the third contract, the Managing General Agency ("MGA") Agreement, Royale Belge authorized another former affiliate of Petitioner ACE, Montgomery and Collins ("M&C"), to write insurance and reinsurance on its behalf.  (Pet'rs' Mem. of Law at 2-3; Pet'rs' Reply Mem. of Law Ex. 3).  M&C procured reinsurance on Royale Belge's behalf from a predecessor of Petitioner ACE INA Insurance, the INA Insurance Company of Canada ("INA Insurance"), pursuant to the fourth relevant contract, the Quota Share Reinsurance Agreement ("QSRA").  (Pet'rs' Mem. of Law at 3; Resp't's Mem. of Law at 1-2; Pet'rs' Reply Mem. of Law Ex. 4).  The end result of these contracts, and the subsequent mergers of various parties to them, is that Petitioners and Respondent have overlapping liability to one another for certain insurance and reinsurance obligations.  Under the terms of the Treaty contracts, overlapping amounts owed can be offset against one another.  (Pet'rs' Reply Mem. of

---

[1]       "Pet'rs' Mem. of Law"  refers to Petitioners' Memorandum of Law in Support of its Petition to Confirm the Arbitration Awards (Docket No. 4); "Resp't's Answer/Cross-Pet." refers to Respondent's Answer to the Petition to Confirm Arbitration Awards and Cross-Petition to Vacate Arbitration Awards (Docket No. 20); "Resp't's Mem. of Law" refers to Respondent's Memorandum of Law in Support of its Cross-Petition to Vacate Arbitration Awards and in Opposition to Petition to Confirm Awards (Docket Nos. 22 and 25); "Pet'rs' Reply Mem. of Law" refers to Petitioners' Brief in Opposition to Respondent's Petition to Vacate and in Further Support of Petitioners' Petition to Confirm (Docket No. 36); "Resp't's Reply Mem. of Law" refers to Respondent's Reply in Support of its Cross-Petition to Vacate Arbitration Awards (Docket No. 54).

Law Ex. 15 at 10; Resp't's Answer/Cross-Pet. Ex. 1 Art. 18; Resp't's Answer/Cross-Pet. Ex. 2 Art. 18).

For several years, Petitioners experienced difficulty recovering payments due from Respondent under the Treaty reinsurance agreements. (Pet'rs' Mem. of Law at 3). In 2007, an arbitration panel addressed a prior dispute related to Layer 1 of Treaty 1001 and issued an award in ACE's favor, which was confirmed without opposition by the United States District Court for the Eastern District of Pennsylvania. (*See* Pet'rs' Reply Mem. of Law at 4; *id.* Exs. 5, 6). Additional disputes arose over enforcement of that award, leading ACE to initiate contempt proceedings against Respondent in the Eastern District of Pennsylvania, which the parties later agreed to submit to arbitration. (Pet'rs' Reply Mem. of Law at 5; *id.* Ex. 13 at 7-8). In 2009, following continuing disputes over payments under Treaty 3083 and Layers 2 and 3 of Treaty 1001, Petitioners commenced new arbitration proceedings against Respondent seeking payment of reinsurance payments they claimed were owed, security to ensure future payments, and a declaration rejecting their liability to Respondent for offsetting reinsurance claims pursuant to the QSRA. (Pet'rs' Mem. of Law at 3; Pet'rs' Reply Mem. of Law at 5). AXA Belgium responded with counter-arbitration demands that included its own claims for payment and initiated two new arbitrations, one under the MGA Agreement and QSRA and one under Treaty 1001 Layer 1. (Pet'rs' Reply Mem. of Law Ex. 13 at 5-8). Respondent disputed its liability for amounts that Petitioners claimed were owed and asserted that it was entitled to offset any amounts due to Petitioners under the Treaties against amounts due from Petitioners pursuant to the QSRA. (Pet'rs' Reply Mem. of Law at 6; Resp't's Mem. of Law at 2).

In its counter-arbitration demands, Respondent also sought to consolidate all of the arbitrations, including the arbitration over the enforcement of the Treaty 1001 Layer 1 arbitration

award.  (Pet'rs' Reply Mem. of Law at 5; *id.* Ex. 13 at 4).  The arbitration over the Treaty 3083

dispute moved most quickly and was the first in which the parties appointed and accepted a panel

of three arbitrators (the "Panel").  (Pet'rs' Mem. of Law at 5).  Petitioners consented to the

consolidation of the Treaty 1001 Layers 2 and 3 arbitrations with the Treaty 3083 arbitration, but

objected to further consolidation.  (*Id.*).  Over Petitioners' objections, however, the Panel ordered

consolidation of all of the arbitrations, including the arbitration over the enforcement of the

Treaty 1001 Layer 1 arbitration award.  (*Id.*).

One of the key disputes before the Panel was the proper interpretation of the termination

provision in the QSRA.  That provision states in full:

> This Agreement may be terminated as of December 31 in any year by either party giving the other not less than three hundred sixty-five (365) days written notice.
> In the event of termination [INA Insurance] shall remain liable on policies effective prior to termination, and for losses occurring prior to the expiration of the policies insuring them.
> Three years after the effective date of termination the value of all then unsettled losses shall be agreed between [INA Insurance] and [Royale Belge]. [INA Insurance] shall pay [Royale Belge] the sum thus established, and [INA Insurance] shall have no further liability with respect to reinsurance ceded hereunder.
> If no agreement can then be reached on the value of unsettled losses, this Agreement shall continue in force until all such liabilities have been settled or until agreement can be reached.

(Pet'rs' Reply Mem. of Law Ex. 4 Art. XIII).  Petitioners argued that the QSRA had been

terminated as of December 31, 1985, and that the cut-off language was triggered at that time.

(Pet'rs' Reply Mem. of Law at 12).  Respondent contended that the QSRA had not been

terminated.  (*Id.* Ex. 13 at 18).  The parties agreed, however, that no agreement had been reached

on the value of "unsettled losses," so that, in the event the QSRA had been terminated,

Petitioners remained liable for such losses.  (Pet'rs' Reply Mem. of Law at 12; *id.* Ex. 13 at 18).

Significantly, however, the parties disagreed on the meaning of the term "unsettled losses." Petitioners took the position that "unsettled losses" meant those losses that had been reported but not settled as of December 31, 1988, three years after the termination of the QSRA. (*Id.* Ex. 12 at 55-57; *id.* Ex. 14 at 13-15). Respondent argued that as long as no agreement on the valuation of such losses was reached, "unsettled losses" included those reported after December 31, 1988. (*Id.* Ex. 13 at 16-18; *id.* Ex. 15 at 8-9). The parties agreed, however, that Petitioners continued advancing money to cover claims pursuant to the QSRA on the condition that they would later seek reimbursement from Respondent. (Pet'rs' Mem. of Law at 6; *id.* at 3 n.3; Resp't's Mem. of Law at 2). This arrangement ended on May 15, 2007, when Petitioners formally terminated the MGA Agreement, allegedly "for cause," following Respondent's nonpayment of amounts Petitioners claimed were owed under the QSRA. (Pet'rs' Reply Mem. of Law Ex. 11).

In the months before the arbitration hearing, the parties submitted two rounds of position statements, conducted extensive document and deposition discovery, identified hundreds of evidentiary exhibits, and submitted two rounds of pre-hearing briefing. (Pet'rs' Reply Mem. of Law at 7; *id.* Exs. 7-10, 12-15). Pursuant to an order by the panel, a few days before the hearing, the parties made a final exchange of exhibits that might be used at the hearing. In particular, Petitioners identified 81 additional documents, while Respondent identified 450. (Pet'rs' Reply Mem. of Law at 8). When pressed to explain the large number of potential additional exhibits identified so close to the hearing date, Respondent's counsel replied that although it was unlikely to use all of the documents at the hearing, "the Panel's order was clear that if we did not make this identification now, our client would have been precluded from introducing the same during our case-in-chief." (*Id.* Ex. 16 at 1).

The hearing began on January 10, 2011, and lasted for nine days.  (Pet'rs' Reply Mem. of Law at 8; *id.* Ex. 17).  During that time, the Panel heard testimony from eleven witnesses — seven called by Respondent and four called by Petitioners.  (Pet'rs' Reply Mem. of Law at 8).  Counsel for both parties were also permitted to make opening and closing arguments, admit exhibits into evidence, submit deposition designations, and propose final awards.  (*Id.* at 8-9).  On the final day of the hearing, the Umpire opened and closed the proceedings by stating the Panel's understanding that the parties had completed their evidentiary submissions. (*Id.* Ex. 17 at 2178, 2336).  Neither party objected to that understanding, asked to submit additional evidence, or argued that it had not been afforded an opportunity to present certain evidence.  (*Id.* Ex. 17 at 2178-82, 2336).

On February 28, 2011 and March 17, 2011, the Panel issued interlocutory awards ("Award One" and "Award Two" respectively).  (*Id.* Ex. 31; Resp't's Answer/Cross-Pet. Ex. 10).  Both awards noted that the Panel had conducted "a final hearing on the merits." (Pet'rs' Reply Mem. of Law Ex. 31 at 1; Resp't's Answer/Cross-Pet. Ex. 10 at 1).  In Award Two — the only award substantively challenged in this case — the Panel unanimously found that the QSRA was terminated effective December 31, 1985.  (Resp't's Answer/Cross-Pet. Ex. 10 ¶ 1).  A Panel majority also found that ACE INA's liability under the under the treaty was cut off as of December 31, 1988, and that the cut-off provision of the QSRA should be applied to all losses as of May 15, 2007, the date that Petitioners ceased fronting funds on Respondent's behalf and formally terminated the MGA Agreement.  (*Id.* ¶¶ 1-2; *see also* Pet'rs' Reply Mem. of Law Ex. 11).  The Panel then unanimously laid out a schedule of payments and a protocol for the presentation of accounts and losses.  (Resp't's Answer/Cross-Pet. Ex. 10 ¶¶ 3-13).  The Panel also found that AXA Belgium "did not deal honorably with Century or Ace INA and, in

particular, did not make a good faith effort to comply with the prior Treaty 1001 Layer 1 Award," and, on that basis, awarded Petitioners the lesser of $250,000 or attorney's fees and expenses.  (*Id.* ¶ 14).

In addition, the Panel announced in Award Two that it would "continue its jurisdiction for a minimum of nine months from the date of this Award."  (*Id.* ¶ 16).  During that nine-month period, the parties were directed "to refer to the Panel for resolution any dispute (including entitlement to interest on late payments) concerning compliance with or arising out of this Award" and to "meet and confer to discuss and potentially agree on an expedited, efficient alternative dispute resolution procedure to be used in the future with respect to disputes governed by this Award."  (*Id.* ¶ 16(a), (b)).  The Panel scheduled a "one day hearing" approximately nine months from the date of Award Two to consider: "a. Whether any modifications to this Award, including the protocols expressed or adopted herein, should be made. b. Whether there is any need for the Panel to retain its jurisdiction for an additional period of time. c. Any additional requests for relief by the parties."  (*Id.* ¶ 17).  Finally, the Panel stated that Award Two "is issued without prejudice to the Panel's continuing jurisdiction and discretion to modify it and/or to issue future interlocutory awards or a final award as justice and equity may require regarding any of the matters addressed herein."  (*Id.* ¶ 18).

The Panel later scheduled the one-day hearing for November 1, 2011, and asked the parties to confer and agree upon a schedule for pre-hearing submissions.  (Resp't's Answer/Cross-Pet. Ex. 11).  On August 8, 2011, Respondent's new counsel submitted a Petition to Modify Award Two (the "Petition to Modify"), asking the panel to reverse its determination that ACE INA's liability under the QSRA was cut off on the grounds that neither the parties nor the Panel had identified the governing law of a specific jurisdiction to support the Panel's

findings and that certain documentary and testimonial evidence that supported Respondent's position had not been presented to the Panel. (*Id.* Ex. 12). Specifically, Respondent sought to introduce documents exchanged by the parties during the negotiations over the QSRA termination provision, and testimony from Francois Gelot, the INA executive who signed the QSRA, related to the intended operation of the provision and the meaning of "unsettled losses." (*Id.* Ex. 12 ¶¶ 19-32). Upon receipt of the Petition to Modify, the Panel asked the parties to agree to a briefing schedule, but shortly thereafter limited any additional briefing "only [to] the discrete issue of whether grounds exist to warrant the re-opening of this case (akin to whether there would be grounds for a new trial in the judicial context)." (*Id.* Ex. 15). The parties agreed that there were no issues, other than those raised in Respondent's Petition to Modify, that needed to be addressed or resolved at the November 1, 2011 hearing, and further agreed that it was unnecessary for the Panel to retain jurisdiction other than to resolve the Petition to Modify and issue a Final Award. (Pet'rs' Reply Mem. of Law Ex. 34).

After the Panel received additional briefing on the "discrete issue" it had identified, it cancelled the November 1, 2011 hearing, and on October 13, 2011, issued a Final Award signed by Petitioners' party arbitrator and the Umpire, with a dissenting opinion from Respondent's party arbitrator. (Resp't's Answer/Cross-Pet. Exs. 18, 19). The Final Award made Awards One and Two final and, in doing so, denied Respondent's Petition to Modify. (*Id.* Ex. 18). The Panel majority explained that its denial was based on the fact that the issue Respondent contested in the Petition to Modify was joined at the outset of the proceedings, that Respondent had in fact addressed the issue itself in its briefs and argument, and that Respondent had failed to provide a valid excuse for not introducing the evidence at the January 2011 hearing. (*Id.*). The Panel also explained that its continuing jurisdiction following Award Two was designed to protect

Petitioners in light of Respondent's problems complying with prior arbitral awards, and that its continuing jurisdiction did not leave the evidentiary record open or permit re-hearing of the substantive issues considered at the January 2011 hearing.  (*Id.*).  Respondent's party arbitrator filed a dissenting opinion that parallels Respondent's arguments in this case — namely, that the newly presented evidence was pertinent and material; that the Panel had explicitly retained jurisdiction to modify Award Two; and that by denying the Petition to Modify and refusing to conduct a hearing, the Panel had refused to hear evidence.  (*Id.* Ex. 19).

## II.   THE PETITIONS TO CONFIRM AND VACATE THE ARBITRATION

### A. Standard of Review

Under both the FAA and the Convention, a reviewing court must confirm an arbitration, unless one of the statutory grounds for vacatur or modification is satisfied.  *See* 9 U.S.C. §§ 9, 207; *see also STMicroelectronics, N.V. v. Credit Suisse Sec. (USA) LLC*, 648 F.3d 68, 74 (2d Cir. 2011).  Specifically, Section 10 of the FAA establishes four instances in which a court may vacate an arbitral award:

(1)   where the award was procured by corruption, fraud, or undue means;

(2)   where there was evident partiality or corruption in the arbitrators, or either of them;

(3)   where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or

(4)   where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a).  In addition, the Second Circuit has held that a court may vacate an award "if [it] find[s] a panel has acted in manifest disregard of the law."  *Porzig v. Dresdner, Kleinwort, Benson, N.A. LLC*, 497 F.3d 133, 139 (2d Cir. 2007).[2]

Significantly, "[a]rbitration awards are subject to very limited review in order to avoid undermining the twin goals of arbitration, namely, settling disputes efficiently and avoiding long and expensive litigation."  *Rich v. Spartis*, 516 F.3d 75, 81 (2d Cir. 2008) (quoting *Willemijn Houdstermaatschappij, BV v. Standard Microsystems Corp.*, 103 F.3d 9, 12 (2d Cir. 1997)). Among other things, the "party moving to vacate an arbitration award has the burden of proof, and the showing required to avoid confirmation is very high."  *STMicroelectronics*, 648 F.3d at 74 (quoting *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 110 (2d Cir. 2006)).  Moreover, "[t]he arbitrator's rationale for an award need not be explained, and the award should be confirmed if a ground for the arbitrator's decision can be inferred from the facts of the case."  *D.H. Blair & Co.*, 462 F.3d at 110 (internal quotation marks and citations omitted).  Deference to the arbitrators' interpretation of contracts is especially strong.  Indeed, "as long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, a court's conviction that the arbitrator has committed serious error in resolving the disputed issue does not suffice to overturn his decision."  *ReliaStar Life Ins. Co. of N.Y. v. EMC Nat. Life Co.*, 564 F.3d 81, 86 (2d Cir. 2009) (internal quotation marks and citations omitted).

---

[2]     As the Second Circuit itself has acknowledged, whether "manifest disregard of the law" remains a proper basis for vacating an arbitration award following the Supreme Court's decision in *Hall Street Associates, L.L.C. v. Mattel, Inc.*, 552 U.S. 576 (2008), is somewhat unclear.  *See, e.g.*, *STMicroelectronics*, 648 F.3d at 78 (noting "skepticism about the validity of [the] 'manifest disregard' doctrine in light of recent Supreme Court precedent," but finding that the respondent had failed to meet it).  This Court need not address the issue, however, as Respondent has failed to demonstrate a manifest disregard of the law here.

**B. Discussion**

In the present case, Respondent contends that the Awards should be vacated on various grounds. First, Respondent asserts that the Panel was "guilty of misconduct . . . in refusing to hear evidence pertinent and material to the controversy." 9 U.S.C. § 10(a)(3). (Resp't's Mem. of Law at 15-19). Second, Respondent argues that the Panel "exceeded [its] powers" by rewriting the agreements between the parties, imposing punitive attorney's fees, and violating its own award. 9 U.S.C. § 10(a)(4). (Resp't's Mem. of Law at 10-15, 20-22). And third, Respondent avers that the Panel acted in "manifest disregard of the law" by failing to apply Belgian contract law. (*Id.* at 22-23).[3] These arguments do not survive scrutiny.

**1. The Panel Did Not Refuse to Hear Evidence**

First, there is no merit to Respondent's claims that the Panel refused to hear evidence that was "pertinent and material" and denied Respondent the right to a "full and fair" hearing. (Resp't's Mem. of Law at 16). Arbitration is not subject to the same rules as a court proceeding and, accordingly, "[a]rbitrators enjoy broad discretion" to decide whether to hear certain evidence and "do not need to allow parties to present every piece of relevant evidence." *Fellus v. Sterne, Agee & Leach, Inc.*, 783 F. Supp. 2d 612, 618 (S.D.N.Y. 2011) (internal quotation marks omitted). As the Second Circuit has emphasized, "[f]ederal courts do not superintend arbitration proceedings." *Tempo Shain Corp. v. Bertek, Inc.*, 120 F.3d 16, 20 (2d Cir. 1997) (quoting *Teamsters, Local Union 657 v. Stanley Structures, Inc.*, 735 F.2d 903, 906 (5th Cir.

---

[3]     Although Respondent nominally also invokes the Convention in its papers, its arguments for vacatur under the Convention are identical to those it makes under the FAA. (Resp't's Answer/Cross-Pet. ¶¶ 63-66). Moreover, it cites no authority for the relief it seeks under the Convention other than the Convention itself. Accordingly, the Court does not separately address the Convention.

1984)).  Instead, judicial review "is restricted to determining whether the procedure was

fundamentally unfair."  *Id.*

Respondent has not demonstrated fundamental unfairness in this case.  In fact, the record

is plain that Respondent was granted a full and fair opportunity to present its case.  First, the

Panel adopted a scheduling order making clear that each party was expected to put on its full

case at the evidentiary hearing.  (Resp't's Answer/Cross-Pet. Ex. 18 ¶ 1.c).  Were there any

doubt on that score, Respondent's counsel himself justified the identification of 450 evidentiary

exhibits shortly before the hearing on the ground that "the Panel's order was clear that if

[Respondent] did not make this identification," it "would have been precluded from introducing

the same during [its] case-in-chief."  (Pet'rs' Reply Mem. of Law Ex. 16).  Second, Respondent

was afforded an opportunity to present its case as it wished, which it did by engaging in

extensive discovery and pre-hearing briefing, calling seven witnesses and cross-examining

Petitioners' four witnesses, submitting evidence, making opening and closing arguments, and

submitting a proposed final award.  (*See* Pet'rs' Reply Mem. of Law Exs. 8, 10, 13, 15, 17, 30).

Third, Respondent possessed or had access to the contested evidence at all times, as it

produced the relevant documents during discovery and was well aware of Gelot's role and

potential testimony.  (*See* Resp't's Answer/Cross-Pet. Ex. 12 (Bates numbers beginning with

"AXABEL"); Pet'rs' Reply Mem. of Law Ex. 4 (QSRA with Gelot's signature); *id.* Ex. 17 at

369-70 (Respondent's counsel's cross-examination of witnesses for Petitioners about Gelot's

signature on the QSRA and Petitioners' failure to contact her or call her as a witness)).  Finally,

the fact that the evidence adduced at the January 2011 hearing would be the basis of an award

was made clear by the Umpire's announcements at the beginning and end of the last hearing day

that the Panel considered the evidentiary record closed at the conclusion of the hearing.  (Pet'rs'

Reply Mem. of Law Ex. 17 at 2178, 2334, 2336).  Respondent's counsel made no objection to these announcements and even submitted a proposed final award, evidencing his understanding that he would not have a further opportunity to present his case.  (*Id.* Ex. 30).

In arguing that vacatur of the Awards is warranted, Respondent relies principally on three cases: *International Union, United Mine Workers of America v. Marrowbone Development Co.*, 232 F.3d 383 (4th Cir. 2000); *Teamsters, Chauffeurs, Warehousemen & Helpers, Local Union No. 506 v. E.D. Clapp Corp.*, 551 F. Supp. 570 (N.D.N.Y. 1982), *aff'd sub nom. Teamsters, Chauffers v. Ed Clapp Corp.*, 742 F.2d 1441 (2d Cir. 1983); *Harvey Aluminum (Inc.) v. United Steelworkers of America, AFL-CIO*, 263 F. Supp. 488 (C.D. Cal. 1967).  (Resp't's Mem. of Law at 16, 18-19).  These cases are extreme examples of arbitrators refusing to hear evidence or conduct proceedings, however, and are easily distinguished from this case.  In *Marrowbone Development Co.*, for example, the arbitration panel cut off the hearing following one party's opening statement and refused to allow either party to present evidence, conduct live witness examinations, or put forth its full argument.  *See* 232 F.3d at 387, 390.  In *E.D. Clapp Corp.*, the arbitration panel refused to complete a second hearing intended to allow one of the parties to complete its case-in-chief.  *See* 551 F. Supp. at 577.  And in *Harvey Aluminum*, the arbitrator adopted the rules of evidence at the rebuttal stage to preclude certain witness testimony, with no warning and no prior announcement of evidentiary rules limiting certain testimony to the parties' case-in-chief.  *See* 232 F. Supp. at 490-94.  The circumstances in these cases are a far cry from those in this case, as Respondent here was on notice of the schedule and rules that would apply to the proceedings, and it had a full and fair opportunity to present its arguments and evidence before the Panel.

13

Contrary to Respondent's assertions (Resp't's Mem. of Law at 15-22), the fact that the Panel explicitly retained jurisdiction in Award Two to make "any" modifications to the award is immaterial.  For one thing, the Panel was free to revise its own ruling, as long as doing so did not create fundamental unfairness.  *Cf. SH Tankers Ltd. v. Koch Shipping Inc.*, 12 Civ. 375 (AJN), 2012 WL 2357314, at *5 (S.D.N.Y. June 19, 2012) (internal quotation marks omitted) (explaining while that the doctrine of *functus officio* bars arbitrators from revisiting final awards subject to judicial review, "the contrapositive is also true: if an arbitrator is not *functus officio* as to an interim award, then the interim award is not subject to judicial review" and is therefore logically subject to revisitation).  Additionally, the Panel itself explained in the Final Award that it retained jurisdiction only to ensure that Respondent complied with the payment protocols in Award Two, not to permit the submission of additional evidence or the reopening of the evidentiary record.  (Resp't's Answer/Cross-Pet. Ex. 18 ¶ 1.c).  This Court is loathe to second guess the Panel's explanation of its own award.  *Cf. Appel Corp. v. Katz*, 217 F. App'x 3, 4 (2d Cir. 2007) (deferring to the American Arbitration Association's interpretation of its own rules); *Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151 n.4. (2009) (citing *In re Casse*, 198 F.3d 327, 333 (2d. Cir. 1999), for the proposition that a bankruptcy court's interpretation of its own order is entitled to substantial deference).  Finally, the Panel's explanation is consistent with the structure of Award Two, as the paragraph preceding the provision retaining jurisdiction to make "any" modification imposed two particular obligations on the parties in connection with that jurisdiction — obligations related to the implementation and continuing operation of the dispute resolution protocols — and did not raise substantive issues at all.  (Resp't's Answer/Cross-Pet. Ex. 10 ¶ 16).

14

Finally, Respondent also contends that the Panel erred by importing the Federal Rules of Civil Procedure into the arbitration.  (Resp't's Mem. of Law at 21).  Specifically, Respondent argues that the Federal Rules of Civil Procedure cannot apply to an arbitration absent an agreement among the parties to apply them, that there was no such agreement in this case, and that the majority adopted the Rules "[b]y requiring AXA Belgium to establish why it would be entitled to a 'new trial' before [it] would hear relevant and material evidence."  (*Id.*). Respondent also argues that the majority adopted the Rules "at the eleventh-hour, long after the ground rules for the arbitration had been discussed and agreed to."  (*Id.*).  The law is clear, however, that arbitrators generally "possess broad latitude to determine the procedures governing their proceedings."  *Commercial Risk Reinsurance Co. Ltd. v. Sec. Ins. Co. of Hartford*, 526 F. Supp. 2d 424, 428 (S.D.N.Y. 2007).  Furthermore, the Panel merely required the parties to abide by the scheduling order and procedural rules it adopted at the outset of the arbitration and analogized to the judicial context in asking the parties to brief whether there were grounds to revisit the Panel's earlier rulings.  That does not amount to an adoption of the Federal Rules of Civil Procedure into the arbitration, as Respondent contends.

In short, Respondent was afforded a full and fair opportunity to present its case and the Panel did not disregard any evidence properly presented.  The fact that Respondent declined to call certain witnesses or present certain evidence within the time allotted — or, more to the point, the fact that, with the benefit of hindsight, it regretted its handling of the hearing — does not constitute fundamental unfairness.  *See, e.g.*, *Capgemini U.S. LLC v. Sorenson*, 04 Civ. 7584 (JGK), 2005 WL 1560482 (S.D.N.Y. July 1, 2005) (holding that vacatur was not warranted where the panel declined to hear evidence introduced after an adverse award, when the party had been afforded a full opportunity to be heard in post-hearing briefing, but had chosen to present

only certain arguments and evidence); *see also, e.g.*, *Verve Commc'ns, PVT Ltd. v. Software Int'l Inc.*, No. 11-1280 (FLW), 2011 WL 5508636 (D.N.J. Nov. 9, 2011) (denying vacatur for refusal to hear evidence where the moving party had the opportunity to take discovery and submit evidence, but declined to do so within the relevant deadlines); *Clarendon Nat. Ins. Co. v. TIG Reinsurance Co.*, 990 F. Supp. 304, 310 (S.D.N.Y. 1998) (denying vacatur for refusal to hear evidence where "the Panel afforded [the moving party] a full opportunity to address every issue before taking the case under submission" and therefore "plainly did not deprive [the moving party] of a fundamentally fair hearing").  Accordingly, there is no basis to Respondent's argument that the Awards should be vacated on ground that the Panel refused to hear pertinent and material evidence.

### 2.  The Panel Did Not Exceed Its Authority

Next, Respondent contends that the Awards should be vacated, pursuant Section 10(a)(4), on the ground that the Panel exceeded its authority.  Significantly, the Second Circuit has "'consistently accorded the narrowest of readings' to [Section 10(a)(4)], in order to facilitate the purpose underlying arbitration: to provide parties with efficient dispute resolution, thereby obviating the need for protracted litigation."  *ReliaStar*, 564 F.3d at 85 (quoting *Banco de Seguros del Estado v. Mut. Marine Office, Inc.*, 344 F.3d 255, 262 (2d Cir. 2003)) (internal quotation marks omitted).  In particular, the Court of Appeals has explained that

> in considering a section 10(b)(4) challenge, the principal question for the reviewing court is whether the arbitrator's award draws its essence from the agreement to arbitrate, since the arbitrator is not free merely to dispense his own brand of industrial justice.  If the answer to this question is yes, however, the scope of the court's review of the award itself is limited.  Notably, we do not consider whether the arbitrators correctly decided the issue.  If the parties agreed to submit an issue for arbitration, we will uphold a challenged award as long as the arbitrator offers a barely colorable justification for the outcome reached.  In other words, as long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, a court's conviction that the

> arbitrator has committed serious error in resolving the disputed issue does not
> suffice to overturn his decision.

*Id.* at 85-86 (internal quotation marks and citations omitted).  "With respect to contract interpretation, this standard essentially bars review of whether an arbitrator misconstrued a contract."  *T.Co Metals, LLC v. Dempsey Pipe & Supply, Inc.*, 592 F.3d 329, 339 (2d Cir. 2010).

Here, Respondent contends that the Panel exceeded its authority in three ways.  First, Respondent argues that the Panel "re-wrote" the parties' contract, and thus exceeded its authority, in finding that ACE INA's liability was cut off as of December 31, 1988, and by ruling that "the cut-off provision of the [QSRA] shall be applied to all losses (whether reported previously or subsequently) as of May 15, 2007."  (Resp't's Mem. of Law at 11-15 (quoting Resp't's Answer/Cross-Pet. Ex. 10 ¶ 2)).  The question of how the QSRA termination provision should be interpreted, however, was hotly contested throughout the arbitration proceedings.  Respondent addressed the issue — in particular, the meaning of the term "unsettled losses" and the scope of the parties' obligations pursuant to the termination provision of the QSRA — in its pre-hearing briefs, and continued making the case for its interpretation in its opening argument, witness examinations, and closing argument.  (*See, e.g.*, Pet'rs' Reply Mem. of Law Ex. 13 at 16-17; *id.* Ex. 15 at 9; *id.* Ex. 17 at 53-60, 824-32, 1060-63, 2262-78).  Petitioners presented the Panel with a competing interpretation of the provision.  (*See, e.g.*, *id.* Ex. 12 at 56-57).  The fact that the Panel largely agreed with Petitioners, not Respondent, does not mean that the Panel failed to reach a decision drawn from the "essence" of the agreement to arbitrate, or failed to provide a "barely colorable justification for the outcome reached."  *ReliaStar*, 564 F.3d at 85.  Given the extensive evidence offered by Petitioners in support of its interpretation of the contract, the Court has no trouble concluding that the Panel was "arguably construing or applying the contract."  *Id.*  That is enough to reject Respondent's contentions.

Second, Respondent argues that the Panel exceeded its powers by violating its own award — specifically, by refusing to consider Respondent's Petition to Modify or conduct the one-day hearing on November 1, 2011, despite the mandatory language used in Award Two. (Resp't's Mem. of Law at 20). Setting aside the question of whether a Panel could be said to "violate" an award that it expressly retained "continuing jurisdiction and discretion to modify," Respondent's argument is unavailing, as the Panel's continuing jurisdiction was intended to oversee payment and resolve disputes regarding the implementation of protocols governing the future interactions of the parties, not to reopen the evidentiary record. (Resp't's Answer/Cross-Pet. Ex. 10 ¶ 18). As discussed above, in establishing its continuing jurisdiction in paragraph 16 of Award Two, the Panel made clear that the jurisdiction was intended to allow it to oversee "any dispute . . . concerning compliance with or arising out of this Award" and to oversee the parties efforts to developed an alternative dispute resolution procedure. (*Id.* ¶ 16(a), (b)). Nowhere in that paragraph did the Panel indicate that it was retaining jurisdiction over the substantive questions at issue in the arbitration, nor in fact for any reason other than to oversee dispute resolution between the parties. To be sure, the language of paragraph 17 — stating an intention to hold a hearing to consider making "any modifications to this Award" (*id.* ¶ 17) — was broader. But the Panel explained in its Final Award that its continuing jurisdiction was intended to help the parties "restore their on going [sic] business relationship" and "nothing more," and was "certainly . . . not . . . to allow Axa to re-open the record on the QSRA to present evidence it has no excuse for not presenting the first time around." (*Id.* Ex. 18 ¶ 1(f)). Thus, there is no basis to say that the Panel exceeded its authority within the meaning of Section 10(a)(4) by violating the terms of its own award.

Third, Respondent asserts that the Panel exceeded its authority by imposing a punitive sanction on Respondent in form of attorney's fees. (Resp't's Mem. of Law at 15; Resp't's Reply Mem. of Law at 4-5). The Second Circuit has held that, "[w]here an arbitration clause is broad, . . . arbitrators have the discretion to order remedies they determine appropriate, so long as they do not exceed the power granted to them by the contract itself." *Banco de Seguros del Estado*, 344 F.3d at 262. In *ReliaStar*, the Court specifically held that a broad arbitration clause authorized an arbitration panel to award attorney's fees for bad faith conduct, even absent a specific authorization to do so and even where there was a specific contractual provision stating that each party would bear its own attorney's fees. *See* 564 F.3d at 86-89. That decision is controlling here, as the arbitration clauses in all four contracts include broad language analogous to the language at issue in *Reliastar*, submitting "any dispute" to arbitration. (Pet'rs' Reply Mem. of Law Ex. 1 Art. 20; *id.* Ex. 2 Art. 19, *id.* Ex. 3 Art. VIII; *id* Ex. 4 Art. XIII). Respondent's contention that the punitive sanction was improperly imposed for its conduct in other proceedings (Resp't's Mem. of Law at 15; Resp't's Reply Mem. of Law at 5), is unavailing, as Award Two makes clear that the Panel found Respondent "did not deal honorably with" Petitioners "in various respects," only one of which was its failure "to make a good faith effort to comply with the prior Treaty 1001 Layer 1 Award." (Resp't's Answer/Cross-Pet. Ex. 10 ¶ 14). Moreover, even if the sanction was based exclusively on Respondent's conduct in the Treaty 1001 Layer I context, Respondent's argument would be meritless, as Respondent itself demanded that issues relating to enforcement of the Layer 1 Award be arbitrated in the present proceedings. (Resp't's Answer/Cross-Pet. Ex. 6; Pet'rs' Mem. of Law at 5; *id.* n. 2). Finally, Respondent itself sought an award of attorney's fees, thereby waiving any argument that such an award was beyond the authority of the Panel. *See, e.g.*, *In re Arbitration Between Gen. Sec. Nat.*

*Ins. Co. & AequiCap Program Adm'rs*, 785 F. Supp. 2d 411, 422-23 (S.D.N.Y. 2011). For all these reasons, it cannot be said that the Panel exceeded its authority in ordering Respondent to pay attorney's fees to Petitioners.

### 3. The Panel Did Not Manifestly Disregard Governing Law

Finally, Respondent contends that the Panel manifestly disregarded the governing law. A party "seeking to vacate an award on the basis of the arbitrator's alleged 'manifest disregard' of the law bears a 'heavy burden.'" *Stolt-Nielsen SA v. AnimalFeeds Int'l Corp.*, 548 F.3d 85, 91, 93-95 (2d Cir. 2008) (quoting *GMS Group, LLC v. Benderson*, 326 F.3d 75, 81 (2d Cir. 2003)), *rev'd on other grounds sub nom. Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 130 S. Ct. 1758 (2010). Specifically, in evaluating whether vacatur is warranted, a court must consider three factors: (1) "whether the law that was allegedly ignored was clear, and in fact explicitly applicable to the matter before the arbitrators"; (2) whether "the law was in fact improperly applied, leading to an erroneous outcome"; and (3) whether the arbitrator knew of the existence of the law, its applicability to the case, and "intentionally" disregarded it. *T.Co Metals*, 592 F.3d at 339 (quoting *Stolt-Nielsen*, 548 F.3d at 93). Ultimately, to warrant vacatur, arbitrators "must appreciate the existence of a clearly governing legal principle but decide to ignore or pay no attention to it." *Westerbeke Corp. v. Daihatsu Motor Co., Ltd.*, 304 F.3d 200, 209 (2d Cir. 2002) (citations omitted).

In the present case, Respondent contends that the Panel manifestly disregarded the law by failing to apply the Belgian law of contracts. (Resp't's Mem. of Law at 22-23). Respondent, however, did not raise the issue of Belgian law in its briefing before the arbitration hearing or at the hearing itself; in fact, it did not raise the issue until its Petition to Modify, approximately five months after the Interlocutory Awards. (Resp't's Answer/Cross-Pet. Ex. 12 ¶ 45). Even then,

Respondent did not actually assert — as it claims here — "that Belgian law governed the QSRA." (Resp't's Mem. of Law at 22).  Instead, it equivocated on the question of what law applied, contending that "the QSRA should be governed by Belgian, or possibly Canadian, law, and an argument might be made that California law should apply." (Resp't's Answer/Cross-Pet. Ex. 12 ¶ 45).  Given that Respondent itself was unable to articulate which law applied, it cannot be said that the "law that was allegedly ignored was clear, and in fact explicitly applicable to the matter before the arbitrators." *Gen. Sec. Nat. Ins. Co.*, 785 F. Supp. 2d at 420.  In any event, even if Belgian law should have been applied, there is no merit to Respondent's claim here, as the only "governing law" that Respondent claims the Panel manifestly disregarded was to interpret contracts "to give effect to the intent of the parties at the time the contract was signed." (Resp't's Answer/Cross-Pet. Ex. 12 ¶ 46).  As the Panel noted, this principle is hardly "novel" and certainly not unique to Belgian law — indeed it is a central tenet of the contract law that the Panel recognized and applied.  (*Id.* Ex. 18).  Accordingly, there is no basis to conclude that the law was "improperly applied" or that it led to "an erroneous outcome."

### C.  Conclusion

In short, Respondent's arguments for vacating the Awards are without merit. Accordingly, Petitioners' petition to confirm the Awards is GRANTED and Respondent's cross-petition to vacate the Awards is DENIED.

## III.   THE MOTIONS TO SEAL

As noted, in addition to the cross-petitions to confirm and vacate the arbitral awards, the Court has before it three motions — two by AXA and one by Petitioners — for leave to file certain documents under seal.  Specifically, AXA seeks to seal portions of its Answer/Cross-Pet.; its Memorandum and Reply Memorandum of Law; and certain exhibits to its Answer/Cross-Pet.,

21

including Award Two, the Panel's Final Award and the dissent therefrom, its Petition to Modify,

Petitioners' Brief in Opposition to the Petition to Modify, and correspondence with the Panel

concerning the events at issue in the present action.  (Docket No. 13).  Petitioners wish to seal

portions of their Answer; their Memorandum and Reply Memorandum of Law; and exhibits to

their Reply Memorandum of Law, including the prior arbitral award, the parties' pre-hearing

position statements and briefs, the transcript of the January 2011 hearing, the parties' proposed

final awards, Award One, and e-mails concerning matters at issue in the arbitration.  (Docket

Nos. 32, 48).[4]  The parties request leave to file these documents under seal pursuant to a

confidentiality agreement they entered, which provides that certain "Arbitration Information" —

including "all briefs, depositions, and hearing transcripts generated in the course of this

arbitration" as well as any "final award and any interim decisions" — shall remain confidential.

(Decl. of Michael S. Gollub in Supp. of Mot. to Seal (Docket No. 15), Ex. A ¶ 2).  The

agreement acknowledges that such Arbitration Information may be disclosed in connection with

a judicial proceeding to confirm, modify, or vacate an arbitration award, but provides that "the

parties agree, subject to court approval, that all submissions of Arbitration Information to a court

shall be sealed."  (*Id.* ¶ 3).

       The question presented is whether these requests to seal are consistent with the well-

established common law right of access to "judicial documents."  That right, which is "firmly

rooted in our nation's history," is "'based on the need for federal courts, although independent —

indeed, particularly because they are independent — to have a measure of accountability and for

the public to have confidence in the administration of justice.'"  *Lugosch v. Pyramid Co. of*

---

[4]      On October 14, 2011, the Part I judge granted Petitioners' motion to seal certain portions
of their initial submissions "until such time as the judge to whom this matter is assigned makes a
determination as to whether any portion of the exhibits . . . should remain under seal."  (Docket
No. 7).

*Onondaga*, 435 F.3d 110, 119 (2d Cir. 2006) (quoting *United States v. Amodeo*, 71 F.3d 1044, 1048 (2d Cir. 1995) ("*Amodeo II*")).  The right applies, however, only to "judicial documents." *See id.*  Thus, the first step in the necessary inquiry is to determine whether the documents at issue "are indeed 'judicial documents." *Id.*  As the Second Circuit has made clear, "the mere filing of a paper or document with the court is insufficient to render that paper a judicial document subject to the right of public access." *Id.* (quoting *United States v. Amodeo*, 44 F.3d 141, 145 (2d Cir. 1995) ("*Amodeo I*")).  Instead, "[i]n order to be designated a judicial document, 'the item filed must be relevant to the performance of the judicial function and useful in the judicial process.'" *Id.* (quoting *Amodeo I*, 44 F.3d at 145).

If the item at issue is a "judicial document," the court must then determine the weight of the presumption of access.  *See id.*  As the Second Circuit has explained:

> [T]he weight to be given the presumption of access must be governed by the role of the material at issue in the exercise of Article III judicial power and the resultant value of such information to those monitoring the federal courts. Generally, the information will fall somewhere on a continuum from matters that directly affect an adjudication to matters that come within a court's purview solely to insure their irrelevance.

*Id.* (quoting *Amodeo II*, 71 F.3d at 1049).  In the final step of the analysis, "the court must 'balance competing considerations against [the presumption of access].'  Such countervailing factors include but are not limited to 'the danger of impairing law enforcement or judicial efficiency' and 'the privacy interests of those resisting disclosure.'" *Id.* at 120 (quoting *Amodeo II*, 71 F.3d at 1050).

Applying this test here, the parties have not shown a sufficient basis to seal the relevant documents.  First, the documents sought to be sealed, which include the arbitral awards under review and portions of the parties' pleadings here, are indisputably judicial documents to which the presumption of access attaches.  *See, e.g.*, *Aioi Nissay Dowa Ins. Co. Ltd. v. ProSight*

*Specialty Mgmt. Co., Inc.*, No. 12 Civ. 3274 (JPO), 2012 WL 3583176, at *6 (S.D.N.Y. Aug. 21, 2012) ("It is well settled that the petition, memoranda, and other supporting documents filed in connection with a petition to confirm an arbitration award (including the Final Award itself) are judicial documents . . . .") (internal quotation marks omitted); *Church Ins. Co. v. Ace Prop. & Cas. Ins. Co.*, No. 10 Civ. 698 (RJS), 2010 WL 3958791, at *3 (S.D.N.Y. Sept. 23, 2010) (noting that a petition to confirm an arbitration award and memorandum of law in support "[c]learly" were judicial documents); *Global Reinsurance Corp.-U.S. Branch v. Argonaut Ins. Co.*, Nos. 07 Civ. 8196 (PKC) and 07 Civ. 8350 (PKC), 2008 WL 1805459, at *1 (S.D.N.Y. Apr. 21, 2008) ("*Global II*") (reaffirming a prior decision that "the arbitration awards were judicial documents to which the presumption of access attaches").

Second, although the "public interest in the relationship between an insurer and its reinsurers is relatively low," *Global Reinsurance Corp.-U.S. Branch v. Argonaut Ins. Co.*, Nos. 07 Civ. 8196 (PKC) and 07 Civ. 8350 (PKC), 2008 WL 126976, at *2 (S.D.N.Y. Jan. 7, 2008) ("*Global I*"), *on reconsideration Global II*, 2008 WL 1805459, the weight to be given the presumption of access here is reasonably high, at least as to some of the documents at issue.  At a minimum, as the discussion of the cross-petitions above makes clear, the pleadings and the arbitration decisions at issue directly affected the Court's adjudication of the case.  *See, e.g.*, *Church Ins. Co.*, 2010 WL 3958791, at *3 ("Clearly, the Petition [to confirm an arbitration award] and Memorandum are judicial documents that directly affected the Court's adjudication of this case."); *accord Aioi Nissay Dowa Ins. Co. Ltd.*, 2012 WL 3583176, at *6.  Indeed, the Awards themselves are "the heart" of what the parties in this case asked "the Court . . . to act upon." *Global II*, 2008 WL 1805459, at *1.

Finally, the parties have not identified sufficient countervailing factors to overcome the presumption in favor of access.  Indeed, like the respondent in *Church Insurance Co.*, the parties here argue "merely that disclosure 'is inconsistent with, and would undermine the objectives of the parties' Confidentiality Agreement and the reinsurance arbitration process in general.'" *Church Ins. Co.*, 2010 WL 3958791, at *3.  (*See* Resp't's Mem. of Law in Supp. of Mot. to Seal (Docket No. 17) at 3; Pet'rs' Mem. of Law in Supp. of Mot. to Seal (Docket No. 43) at 3; Resp't's Mem. of Law in Supp. of Mot. to Seal (Docket No. 52) at 3-4).  As the Court held in *Church Insurance Co.*, however, the "'mere existence of a confidentiality agreement' . . . does not demonstrate that sealing is necessary."  *Church Ins. Co.*, 2010 WL 3958791, at *3 (quoting *Mut. Marine Office, Inc. v. Transfercom Ltd.*, No. 08 Civ. 10367 (PGG), 2009 WL 1025965, at *5 (S.D.N.Y. Apr. 15, 2009)); *see also, e.g.*, *Aioi Nissay Dowa Ins. Co. Ltd.*, 2012 WL 3583176, at *6 (denying a motion to seal arbitration documents on the basis of a confidentiality agreement and noting that courts in this district have "consistently refused to seal the record of a petition to confirm an arbitration award, notwithstanding the existence of such an agreement"); *Alexandria Real Estate Equities, Inc. v. Fair*, 11 Civ. 3694 (LTS), 2011 WL 6015646 (S.D.N.Y. Nov. 30, 2011) (denying motion to seal arbitration documents on the basis of a confidentiality agreement).

At bottom, the confidentiality agreement at issue in this case may be binding on the parties, but it is not binding upon the Court.  And while parties to an arbitration are generally "permitted to keep their private undertakings from the prying eyes of others," the "circumstance changes when a party seeks to enforce in federal court the fruits of their private agreement to arbitrate, *i.e.* the arbitration award."  *Global I*, 2008 WL 126976, at *1; *see also, e.g.*, *Global II*, 2008 WL 1805459, at *2 ("In circumstances where an arbitration award is confirmed, the public in the usual case has a right to know what the Court has done.").

## IV.   CONCLUSION

For the reasons discussed above, Petitioners' petition to confirm the Awards is GRANTED, Respondent's cross-petition to vacate the Awards is DENIED, and the parties' motions to seal are all DENIED.  The parties are hereby ORDERED to file unredacted copies of all previously sealed documents on ECF no later than **October 9, 2012**.

The Clerk of the Court is directed to terminate the aforementioned motions (Docket Nos. 13, 19, 32, 48) and to close this case.


SO ORDERED.

Dated:  September 24, 2012
        New York, New York

JESSE M. FURMAN
United States District Judge